IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 28, 2018

## STATE OF TENNESSEE v. NICHOLAS WYATT BARISH

**Appeal from the Criminal Court for Knox County**
**No. 97586     G. Scott Green, Judge**

_____

### No. E2017-01794-CCA-R3-CD

_____

The Defendant-Appellant, Nicholas Wyatt Barish, was convicted by a Knox County jury of two counts of first degree felony murder and one count of second degree murder, see Tenn. Code Ann. §§ 39-13-202, -210, for which he received an effective sentence of life imprisonment. In this appeal as of right, the Defendant argues that the evidence was insufficient to support his convictions of first degree felony murder because he did not have the requisite mental state to commit the predicate crimes of theft, burglary, and robbery. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and TIMOTHY L. EASTER, JJ., joined.

Gerald L. Gulley, Jr. (on appeal) and Philip Lomonaco (at trial), Knoxville, Tennessee, for the Defendant-Appellant, Nicholas Wyatt Barish.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Charme Allen, District Attorney General; and Kevin Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On May 13, 2011, the Defendant struck the victim, Mathew E. Proctor, multiple times in the back of the head with a rock and left him face down in a river embankment, where the victim drowned as a result of his injuries. State v. Nicholas Wyatt Barish, No. E2012-01353-CCA-R3-CD, 2013 WL 5436909, at *1 (Tenn. Crim. App. Sept. 27, 2013), perm. app. denied (Tenn. Mar. 5, 2014). Before leaving the scene, the Defendant returned to his car and put on a pair of gloves. He then entered the victim's car in search of drugs and retrieved the victim's cell phone, keys, and $420. Id. at *14. The victim's

body was found later that night by two passing fishermen. The Defendant was developed as a suspect in the investigation and subsequently charged by presentment with alternative counts of felony murder based on theft, robbery, and burglary and additional counts of especially aggravated robbery and burglary. The Defendant entered a guilty plea to the burglary offense; however, he was convicted by a jury on the remaining charges. On appeal, this court reversed and remanded for new trial based on the trial court's improper *ex parte* communications with the jury during its deliberations. Id. Upon remand, on December 12, 2016, the following proof was adduced at trial.

Michael Mays, records keeper for the Knox County Emergency Communications District, testified that he preserved the 911 call on May 13, 2011, reporting the finding of the victim's body. The 911 call was played for the jury.

John Scarlett testified that he was fishing with a friend on the evening of May 13, 2011, when they found the victim's body at the embankment of Turkey Creek Inlet. He said he "could tell [the victim] was dead" and called 911. He recalled a "little white car" at the scene.

Christopher Marney testified that he had been friends with the Defendant for seventeen years and that the Defendant asked him to provide an alibi for the day of the victim's murder. Marney said the Defendant "wanted me to say that I was with him between the hours of three and nine[,]" that they were "[w]atching movies, cruising around, stuff like that[,]" and that he, the Defendant, and the victim "hooked up briefly [and] made an exchange[.]" After the police "immediately saw through" his alibi, he told the police that he had not seen the Defendant on May 13, 2011. On cross-examination, Marney clarified that the Defendant asked him to provide an alibi after the crimes occurred.

Susano Sanchez testified that he worked with the victim in the days leading up to his murder. On May 13, 2011, Sanchez said the victim was frequently on his phone and that the victim showed him a "silver container, metal box" containing $3500 inside. On cross-examination, Sanchez admitted he had only known the victim for two days. Sanchez also said the victim's money came from selling marijuana.

Sergeant McKenzie Alleman of the Knox County Sheriff's Office responded to the 911 call of the victim's body found at the embankment and recorded a video of the crime scene, which was played for the jury at trial. She photographed the crime scene, explained that the victim's body was lying face down in the water, and noted that there was "reddish brown staining" believed to be blood on rocks nearby. After the victim was taken out of the water, "scrapes and lacerations [] from his knees down his shins" and "a large injury to the side of the [victim's] head" were visible. Sergeant Alleman further

noted that the victim's watch and wallet were found on his person. There was no cash inside the wallet, but the victim's driver's license and credit card were found inside. The victim's hat was located near his body and his shoes were found floating in the water.

Sergeant Alleman then identified photographs of the victim's white BMW that was located across the street from the crime scene and noted that the driver's window was down and the driver's door was not completely closed. Inside the victim's car, Sergeant Alleman found a "sprinkler head with 38 unknown pills" and multiple single serve plastic bags similar to those later found at the Defendant's house. The Defendant's car was also inventoried and inside there was "a plunger style syringe" and "a bent spoon that appeared to be drug paraphernalia." Sergeant Alleman testified that she, Detective Dale Dantzler, and Detective Walt Smith executed a search warrant at the Defendant's house. She collected evidence from the Defendant's bedroom, including a "silver tin box" containing single serve plastic bags similar to those found in the victim's car and other drug paraphernalia. She also noted that the Defendant's fishing poles in the garage were covered in cobwebs, which indicated that they had not been used recently. Sergeant Alleman testified that she did not recover the victim's cell phone but that Chief Cowan retrieved a "red and silver" LG cell phone located "on the side of the road." On cross-examination, Sergeant Alleman testified that the victim's car was also inventoried and inside they found "a green leafy substance and a pipe[.]"

The trial court held a jury-out hearing to determine whether Keri Weatherford, the victim's girlfriend at the time of his death, was unavailable for purposes of admitting her former testimony. After hearing from the victim witness coordinator and criminal investigator for the Knox County Attorney General's office, the trial court determined that Weatherford was an unavailable witness subject to an instanter subpoena and, without objection, the State read her former testimony into the record. On the final day of trial, Weatherford was arrested and brought to the courthouse. Defense counsel chose not to call her as a witness.

In her prior testimony, Weatherford testified that she was the victim's girlfriend and lived with him in his parents' house. She described the victim as someone who was very clean and did not like to get dirty. She said he "was a great swimmer" and enjoyed scuba diving and fishing. She confirmed that she was bisexual, that the victim was straight, and that she did not know the victim to have relations with other men. She said she met the Defendant several years prior because the victim was the Defendant's friend and drug dealer. She agreed she never knew the victim and the Defendant to have a relationship other than through drugs. She said the victim earned money by selling drugs and explained that he would "keep everything in this little tin Eddie Bauer box and then at night instead of taking his stuff into his parents' house, he hid them in the sprinkler system outside in the yard." She testified that the victim used his cell phone to sell drugs

and that his phone "never left his hand or his pocket." She confirmed that the victim owned a white BMW and said he never left the car unlocked. On May 13, 2011, Weatherford said she, the victim, and several friends were drinking at a local bar when the victim had to "make a run." She said the victim left between 6:30 p.m. and 7:30 p.m. to sell drugs, that he said he would "be back in 15" minutes, and that he left his bar tab open. She asserted that the victim "wouldn't go somewhere and get dirty" because he planned to return to the bar. She confirmed that she did not see any bruises or lacerations on the victim or "any open gashes on his skull" that night, but said he "bumped his head" on a door earlier that evening.

Captain Brad Hall of the Knox County Sheriff's Office testified that he obtained the phone records of the victim and the Defendant for the days leading up to the victim's murder. The records showed that the last person who contacted the victim was the Defendant. The victim's phone was last connected to a cell tower at 8:11 p.m. on the night of his murder, and Detective Hall explained this could be because the phone lost power, was turned off, or did not have access to a tower. Captain Hall also obtained a video recording of the traffic cameras from May 13, 2011. The video recording showed the victim and the Defendant traveling the same route to a Domino's parking lot shortly before 8:00 p.m. Shortly after 8:00 p.m., both men could be seen exiting the side street connected to Domino's and traveling the same route to their "ultimate destination" at the embankment across from a U.S. Cellular store. Captain Hall obtained surveillance footage from U.S. Cellular which showed the Defendant and the victim parking their cars across from the embankment at 8:11 p.m. At 8:13 p.m., the video showed both men walk across the street and go out of view down the embankment. At 8:17 p.m., the victim briefly returned to the street and then went back down to the embankment. At 8:23 p.m., the Defendant returned to the street alone, walked across the street, and opened the doors of his car. The Defendant then opened and leaned into the front door and trunk of the victim's car. The Defendant then returned to his own car and drove away. On cross-examination, Captain Hall explained that the Defendant and the victim exchanged multiple text messages the day before and the day of the victim's murder. Captain Hall agreed that the text messages "appear" to show that the Defendant owed money to the victim.

Knox County Sheriff's Detective Dale Dantzler testified that he reviewed the cell phone records of the Defendant and the victim and confirmed that the last person to contact the victim on the night of his murder was the Defendant. On May 16, 2011, the Defendant was pulled over by police for driving on a revoked license and gave a statement regarding the instant crimes, which was played for the jury at trial. After the interview, the Defendant took Captain Clyde Cowan and Lieutenant Mark Webber to the location where the Defendant "smashed" the victim's phone on the side of the road. Detective Dantzler confirmed that he was present when the Defendant gave "sworn prior

testimony" at his previous trial, which was also played for the jury. On cross-examination, Detective Dantzler confirmed that the Defendant did not tell him that he robbed the victim of his phone and keys. Detective Dantzler was unsure whether testing was performed on the victim's phone but confirmed it was given to the forensic computer crimes unit. He recalled "a green leafy substance and a pipe" found in the victim's car and the State stipulated that a scale was also found inside. Asked if there were any facts that showed the victim's cell phone and keys were down at the bottom of the hill under the bridge, Detective Dantzler said, "No." On redirect, Detective Dantzler identified the victim's cell phone on the evidence log but confirmed it was not an exhibit at trial.

In his May 16, 2011 recorded statement to police, the Defendant initially admitted to meeting the victim the night of his murder for "two minutes." After the Defendant was Mirandized and waived his rights, he explained that he visited the victim at his house around 2:30 p.m. on May 13, 2011, to buy drugs and stayed for approximately twenty minutes. The Defendant said he returned home by 3:00 p.m. and his friend, Chris Marney, came over around 3:30 or 4:00 p.m. The Defendant said he and Marney later met a lady named Suzanne to buy more drugs around 4:30 p.m. Around 7:45 p.m., the Defendant said he spoke to the victim and that the Defendant, the victim, and Marney met beside Domino's to exchange drugs and money. The Defendant said the victim then left to meet someone else and the Defendant immediately went home. He said Marney left around 9:30 or 10:00 p.m. and then the Defendant visited his brother, Lewis Barish, until around 1:00 a.m. The Defendant said he never met the victim at the embankment and that he did not speak to the victim again after their exchange on May 13, 2011. The Defendant said he learned of the victim's death the next day from mutual friends.

When pressed by the police, the Defendant gave a different version of events. He explained that after he met the victim at Domino's, they went down to the embankment to go fishing. He said the victim fell, hit his head on the rocks, and then drowned in the water. He said he was too scared to call 911 and feared that he would be held responsible for the victim's death. He said he then put on gloves and searched the victim's car for drugs and money. He admitted that he took the victim's keys and phone, threw the keys in the woods, and was willing to show the police where he smashed the victim's phone on the side of the road. He said he returned his fishing poles to his garage. When further pressed by the police, the Defendant said he tried to save the victim and performed cardiopulmonary resuscitation (CPR) on the victim, but the victim drowned almost immediately. The Defendant said he left the victim face up with half of his body in the water. He also admitted to taking a tin metal box which he believed contained money from the victim's car and said he threw it in the woods with the keys. The Defendant asserted, "I did not hit him in the back of the head with a rock."

In his prior sworn testimony from his first trial, the Defendant testified that he lived with his father and had known the victim for four to five years. The Defendant admitted that he was addicted to drugs and used the syringes found in his house to inject them. He explained that the victim was his drug dealer but in the weeks before the victim's murder their relationship turned into a secret "sexual" relationship. He said he and the victim would have sex "anywhere that was convenient," including on the embankment where the victim was killed and in the backseat of cars. He said Keri Weatherford was not the victim's girlfriend and believed she was a lesbian. On the day before the murder, the Defendant said he purposefully ignored the victim's calls and texts because he owed the victim money. He admitted that his previous statement to the police was not true and that he did not meet the victim until around 8:00 p.m. at Domino's to exchange drugs and money. The Defendant said they then decided to go to the embankment to have sex. He explained that he and the victim drove separately and parked across the street from the embankment. He said the victim put his phone on the car charger before both men went down to the embankment. The Defendant confirmed that he did not have a gun, knife, or weapon with him. He said the victim briefly returned to the street to check on his car and then returned to the embankment. The Defendant then told the victim he had "started to develop feelings" for the victim at which point the victim implied he was only interested in sex. The Defendant said he "lost it," he "freaked out," that "rage took over, and [he] tackled" the victim. He said he was on top of the victim when he grabbed a rock and hit the victim in his head "more than twice." He said the bruising on the victim's arm "must have been when I grabbed his arm when he tried to hit me." The Defendant explained that the men eventually ended up in the water and that he thought the victim was dead when he stopped moving. The Defendant said he then returned to his car, put on gloves, and "rifled through [the victim's] car for pills or money." He confirmed that he found $420 but no drugs in the victim's car. On May 16, 2011, the Defendant was arrested and gave consent to the police to search his person, car, and house. The Defendant said he asked Chris Marney to provide an alibi and admitted to lying to the police because he was "scared," "freaked out," "embarrassed," and "tried to cover it up."

On cross-examination, the Defendant agreed that he could not dispute Keri Weatherford's testimony that she shared a room with the victim and was the victim's girlfriend. The Defendant confirmed that his house was approximately one to two miles from the embankment and that the house was empty the night of the murder. He agreed that the victim liked to maintain his appearance and that he did not like to get dirty when dressed nicely. He confirmed that he knew the victim was a successful drug dealer and that he kept money in the silver tin box and drugs in the sprinkler head. The Defendant said he did not steal the sprinkler head the night of the murder because it was behind the seat and he did not look back there. He described the method he used to ingest drugs, confirming that he used a spoon and syringe similar to those found in his house and car.

Regarding the night of the murder, the Defendant said he knew the victim was at the bar before they met and that he only intended to make a brief exchange with the victim. He denied that the victim's last call was with the Defendant because he said he saw the victim talking on his phone before they went down to the embankment. After hitting the victim in the head multiple times, the Defendant thought the victim was dead and said he left him face down in the water. He denied taking the victim's wallet, cash, or cell phone from his pockets and said, "[T]hat was not my intention at the time." He said he knew the victim kept a stash of pills on his person or in his car and that he wanted those drugs. He agreed that this was the first time he claimed that he killed the victim after being "provoked" by the victim.

Dr. Christopher Lochmuller, an expert in pathology and autopsy and the Chief Deputy Medical Examiner for Knox County, testified that he examined the body of the victim and concluded that the manner and cause of death was homicide, specifically "drowning due to fresh water emersion with incapacitation due to blunt force injuries of [the] head." He explained that the victim's lungs were filled with water and "aspirated plant material" and that there were "four distinctly separate impact sites on the back of the [victim's] head associated with bruising of the brain and some hemorrhage around a part of the brain." There were also scrapes and bruises across the victim's body and "a pattern injury on the left arm consistent with an imprint of four fingers[,]" indicative of the victim being grabbed from the side or from behind. Dr. Lochmuller testified that the toxicology report showed the presence of oxycodone, alprazolam, and marijuana in the victim's system. Regarding the blunt force injuries, Dr. Lochmuller opined that for "[s]omeone as healthy as this individual, those injuries should not have been fatal by themselves." Dr. Lochmuller confirmed that these injuries could not have happened from the victim "rolling and somersaulting down a rocky terrain." He opined that the victim was likely attacked from behind because "[i]t would be difficult to strike somebody with an object on the back of the head if you were in front of them." On cross-examination, Dr. Lochmuller said he saw blood on the rocks at the crime scene and confirmed that a rock could have been used to cause the victim's blunt force injuries. He agreed that the injuries on the victim's back could have been consistent with "falling down hard [] on these rocks" or "being dragged" across the rocks.

Lewis Barish, the Defendant's brother, identified the house where officers performed the search warrant as his father's house where the Defendant lived. He identified the Defendant's fishing poles in the garage and agreed that the garage was in the same or similar condition in the photographs as it was when the Defendant was arrested. On cross-examination, he admitted that he did not take the photographs of the house and garage and was not present when they were taken.

On December 15, 2016, the Defendant was convicted of two counts of first degree felony murder (counts one and three) and one count of the lesser included offense of second degree murder (count two). See Tenn. Code Ann. §§ 39-13-202, -210. The trial court merged counts two and three into count one and imposed a life sentence. On January 9, 2017, the Defendant filed a motion for new trial, which was amended on August 30, 2017. The trial court denied the motion on August 31, 2017. It is from this judgment that the Defendant appeals.

## ANALYSIS

On appeal, the Defendant argues that the evidence is insufficient to sustain his convictions for first degree felony murder. The Defendant does not dispute that he murdered the victim. Instead, the Defendant asserts that the theft and burglary were "crime[s] of opportunity after the killing" as evidenced by the fact that the victim's wallet and watch were still on his person, and the burglary and theft of the victim's car happened after the murder. The State responds that the evidence at trial, including the Defendant's own admissions, is sufficient to support the Defendant's convictions and the determination that the Defendant had the requisite mental state prior to or concurrent with the killing. As to the Defendant's convictions for felony murder in counts one and three, we agree with the State. Because the Defendant was convicted of the lesser-included offense of second degree murder in count two, we disregard his argument addressing that issue on appeal.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon

direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

As relevant in this case, felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . burglary [or] theft[.]" Tenn. Code Ann. § 39-13-202(a)(2). The culpable mental state required for a felony murder conviction is the intent to commit the underlying felony, namely burglary and theft in this case. Tenn. Code Ann. § 39-13-202(b); see Wagner, 382 S.W.3d at 299. "A person commits burglary who, without the effective consent of the property owner . . . enters any freight or passenger car, automobile, truck, trailer, boat, airplane or other motor vehicle with intent to commit a felony, theft or assault or commits or attempts to commit a felony, theft or assault." Tenn. Code Ann. § 39-14-402(a)(4). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a).

The Defendant argues that the proof in this case was insufficient to prove that he had the culpable mental state to commit theft or burglary when he killed the victim. Therefore, we must determine whether the evidence supporting his underlying convictions satisfies the felony murder rule. The felony murder rule applies when the killing is "'done in pursuance of the unlawful act, and not collateral to it.'" State v. Banks, 271 S.W.3d 90, 140 (Tenn. 2008) (quoting Rice, 184 S.W.3d at 663). In other words, "'[t]he killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it.'" State v. Thacker, 164 S.W.3d 208, 223 (Tenn. 2005) (quoting Farmer v. State, 296 S.W.2d 879, 883 (Tenn. 1956)).

"A killing that precedes, coincides with, or follows the commission of an underlying felony will be considered 'in the perpetration of' the underlying felony, so long as there is a connection in time, place, and continuity of action." Wagner, 382 S.W.3d at 299 (citing State v. Pierce, 23 S.W.3d 289, 294-97 (Tenn. 2000); State v.

Buggs, 995 S.W.2d 102, 106 (Tenn. 1999)). There should also be a causal connection between the killing and the underlying felony. Buggs, 995 S.W.3d at 106 (citing Farmer, 296 S.W.2d at 884; State v. Severs, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988)). Requiring this causal connection supports the deterrent effect of the felony murder rule by excluding killings that are "collateral to and separate from the underlying felony." Pierce, 23 S.W.3d at 296.

In a felony murder case, the "intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim." Buggs, 995 S.W.2d at 107. If the underlying felony and killing were part of a continuous transaction with no break in the chain of events and the felon had not reached a place of temporary safety between the events, felony murder is sufficiently established. Pierce, 23 S.W.3d at 295. "[W]hether a defendant intended to commit the underlying felony, and at what point the intent existed, is a question of fact to be decided by the jury after consideration of all the facts and circumstances." Wagner, 382 S.W.3d at 300 (citing Buggs, 995 S.W.2d at 107). As applicable in this case, "a jury may reasonably infer from a defendant's action immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." Buggs, 995 S.W.2d at 108 (citing State v. Addison, 973 S.W.2d 260, 266 (Tenn. Crim. App. 1997); State v. Johnson, 661 S.W.2d 854, 861 (Tenn. 1983); State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

The evidence, when viewed in the light most favorable to the State, is sufficient to sustain the Defendant's convictions for first degree felony murder. The proof established that on May 13, 2011, the Defendant was aware that the victim had a substantial amount of drugs and money because the victim was a known drug dealer. At his first trial, the Defendant admitted that he became angry with the victim, struck him in the head with a rock multiple times, and left him face down in a river embankment. The medical examiner confirmed that there were "four distinctly separate impact sites on the back of the [victim's] head associated with bruising of the brain and some hemorrhage around a part of the brain." Moreover, the surveillance footage confirmed that the Defendant and the victim parked their cars across from the embankment at 8:11 p.m., and both men walked across the street to the embankment at 8:13 p.m. At 8:17 p.m., the victim briefly returned to the street and then went back down to the embankment. Six minutes later, the Defendant returned to the street alone, opened the doors of his car, and put on gloves. He then opened and leaned into the front door and trunk of the victim's car. The Defendant returned to his own car and drove away. The surveillance footage corroborates the Defendant's admission that he riffled through the victim's car and took his keys, phone, and a tin can where the victim kept his money. Based on this evidence, a rational jury could have reasonably inferred that the Defendant had the intent to commit theft and

burglary prior to, or concurrent with, the killing of the victim. Accordingly, we conclude that the evidence is sufficient to sustain the Defendant's convictions.

## **CONCLUSION**

Based on the foregoing reasoning and analysis, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE